UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FRANK MACIAS,<br><br>    Plaintiff<br><br>v.<br><br>STATE OF NEVADA, et al.,<br><br>    Defendants | Case No.: 3:19-cv-00310-ART-CSD<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF Nos. 54, 62 |

    This Report and Recommendation is made to the Honorable Anne R. Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

    Before the court is Defendants' motion for summary judgment. (ECF Nos. 54, 54-1 to 54-2, 56-1 to 56-20, 59-1.) Plaintiff filed a response. (ECF No. 63.) Defendants filed a reply. (ECF No. 68.)

    Plaintiff also filed a motion for summary judgment. (ECF No. 62.) Defendants filed a response. (ECF No. 67.) Plaintiff filed a reply. (ECF No. 69.)

    After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part, and that Plaintiff's motion be denied.

## I. BACKGROUND

    Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (First Amended Complaint (FAC), ECF No. 23-1.) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison (ESP). (*Id.*)

The court screened Plaintiff's FAC and allowed him with claims under the Eighth Amendment for deliberate indifference to serious medical needs against defendants Gloria Carpenter, Gregory Martin, Timothy Filson, Corey Rowley, and John Doe 1.[1]

Plaintiff alleges that on May 14, 2017, he broke his wrist and was taken to the hospital, and was placed in a splint and was told he needed to return in a few days once the swelling went down so the bones could be re-set and a hard cast could be put in place. Plaintiff avers that Rowley was one of the transport officers who was present when medical staff informed Plaintiff he needed to return in a week. Plaintiff further alleges that Carpenter, Filson, and Martin were aware of Plaintiff's need to receive treatment within the prescribed time frame, but they failed to ensure he was returned to the hospital as ordered.

Plaintiff goes on to allege that he was not timely taken back to the hospital, and by the time he was seen, the bones in his wrist healed in a malunion, causing permanent damage. Plaintiff claims that doctors recommended surgery to correct this condition, but Filson, Martin and Carpenter refused to approve the surgery.

Defendants move for summary judgment, arguing: (1) Crowley was only responsible for transportation and did not personally participate in the alleged violation of Plaintiff's rights; (2) Carpenter was the director of nursing and was not responsible for scheduling appointments, and does not make decisions regarding approval of surgery; (3) Plaintiff was provided with appropriate care; and (4) they are entitled to qualified immunity.

---

[1] To date, there has been no proof of service as to Timothy Filson, and a notice of intent to dismiss Filson has been issued such that Filson will be dismissed if no proof of service is filed by February 11, 2023. In addition, Plaintiff did not timely seek to substitute a defendant in the place of John Doe 1. Therefore, it will be recommended that John Doe 1 be dismissed without prejudice.

2

Plaintiff argues that surgery was recommended for his fractured wrist, but Martin and Carpenter failed to submit a surgical referral to the Utilization Review Panel (URP), which resulted in Plaintiff being denied surgery. As a result, Plaintiff claims that his wrist healed in a malunion, and this has caused him pain and permanent deformity in his wrist.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

*& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A. Facts**

On May 14, 2017, Plaintiff fell and injured his wrist while playing football at the prison. His wrist was swollen and some deformity was noted, and he was transported to the emergency room at William Bee Ririe Hospital (WBRH). (ECF No. 56-2 at 2.)

At WBRH, an x-ray showed a left wrist fracture: comminuted intraarticular fracture of the distal radius and fracture of the ulna (ulnar styloid). (ECF No. 56-3 at 3, 4.) There was minimal displacement. There was no orthopedist on call so Plaintiff's wrist was placed in a splint, and he was referred to orthopedics. (ECF No. 56-3 at 2, 10.) The discharge instructions indicate he was to follow up with orthopedics in two days. (*Id*. at 3.)

On May 16, 2017, Martin requested an orthopedic follow up at WBRH for union of the left ulna/radial fracture. (ECF No. 56-4 at 2.)

Plaintiff was seen by Oluwaseun Akinbo M.D., at WBRH on May 22, 2017. X-rays were taken again and showed incomplete healing of the comminuted displaced fracture at the distal aspect of the radius and fracture of the ulnar styloid. (ECF No. 56-5 at 2.) The notes from his appointment state that Plaintiff was supposed to have been seen the prior week, "but that visit was cancelled because of security reasons." The splint was still in place, and Plaintiff was able to wiggle all of his fingers and sensation was intact over all of his fingers. Dr. Akinbo's assessment states:

> A/P: Left distal radius fracture of an unstable pattern, will benefit from surgical fixation
>
> --Plan to obtain pre-authorization for surgery
>
> --Keep splint in place
>
> --Can't perform surgery today or tomorrow because screws needed for surgery have to be shipped in
>
> --Will perform surgery when screws are available
>
> --Surgery discussed with patient, nature of fracture discussed with patient

(ECF No. 56-5 at 4.)

On May 31, 2017, nine days after his last appointment, Martin requested an orthopedic follow up at WBRH for non-union of the ulna and radial fracture. This was authorized that day. (ECF No. 56-6 at 2.)

Plaintiff was seen by Dr. Akinbo for a follow-up at WBRH again on June 6, 2017. Dr. Akinbo's notes state: "Patient is a prisoner, at initial evaluation, *surgical management was recommended but the state denied it*. He has been managed conservatively in a splint. Today, he reports better pain control." (ECF No. 56-7 at 2, emphasis added.) He was advised to follow-up in four weeks for re-evaluation with x-rays, and his cast was to be removed prior to the x-ray. He was prescribed Tramadol for pain control. He anticipated Plaintiff would transition to a "cock-up wrist splint" at the follow-up assuming the x-rays were acceptable. (*Id.*)

That same day, Martin requested an orthopedic follow up at WBRH in four to five weeks, which was authorized on June 7, 2017. (ECF No. 56-8 at 2.)

Plaintiff saw Dr. Akinbo at WBRH again on July 6, 2017. Dr. Akinbo noted Plaintiff was in a cast. The x-ray revealed an incompletely healed distal radius fracture with mild volar subluxation and loss of inclination. Dr. Akinbo described his condition as "malaligned."

Plaintiff's cast was removed, and he was transitioned to the "cock-up wrist splint," and he was instructed to follow up in six weeks for re-evaluation with x-rays. (ECF No. 56-9 at 2-5.)

On July 10, 2017, Martin requested an orthopedic follow-up at WBRH regarding the left distal radius nonunion/malaligned fracture, which was approved. (ECF No. 56-10 at 2.)

Plaintiff saw Dr. Glenn Miller at WBRH for a follow-up on August 31, 2017. He reported persistent pain and stiffness in the left wrist. A deformity was noted on the left wrist, as well as limited range of motion. Dr. Miller's impression was malunion of the distal radius with secondary posttraumatic degenerative joint disease of the radial carpal joint. The plan at that time was to get Plaintiff out of the splint and use an Ace bandage for support and to have him do range of motion exercises. Dr. Miller noted that it is possible the wrist will go on to experience further degenerative changes with more complaints of pain with use over the next several months. He was instructed to follow up in three months with an x-ray. Dr. Miller recommended considering radiocarpal fusion with dorsal synthesis plating and grafting. (ECF No. 56-11 at 4-5.)

On October 5, 2017, Martin requested an orthopedic follow up at WBRH for the left displaced/non-union of the painful radius/ulna fracture, which was authorized. (ECF No. 56-12 at 2.)

Plaintiff was next seen at WBRH on October 11, 2017, by Dr. Gary Zeluff. Dr. Zeluff noted that Plaintiff was seen initially on the date of his injury on May 14, and then was seen eight days later by Dr. Oluwaseun (Akinbo) since orthopedics was not available (on the date he initially presented to the hospital). Dr. Zeluff indicated that when Plaintiff saw Dr. Akinbo, it was felt that the injury should be reduced and fixed with screws, "however the proper equipment was also not available and therefore he was treated conservatively." He was not seen by

orthopedics until August 31, 2017, by Dr. Miller, who recognized this as being a malunion. Plaintiff had also started to develop signs of early degenerative arthritis. Dr. Miller discussed with Plaintiff the possibility that this may ultimately require a wrist fusion. (ECF No. 56-13 at 2.) On examination, Plaintiff had minimal visible offset, but palpable displacement of the carpus in the volar direction relative to the palpable distal radius. He also had limitation in range of motion. Dr. Zeluff confirmed the prior x-ray revealed the fracture healed in a malunion, and there was evidence of posttraumatic arthritis. Dr. Zeluff's assessment was that Plaintiff had posttraumatic arthritis in the left wrist secondary to the malunion distal radius fracture. No further diagnostics were required at that point.

     Dr. Zeluff advised Plaintiff that his best option at that point was to continue using the wrist brace, to use an Ace bandage under the brace to give additional cushioning, and to continue working on the gradual range of motion exercises. He further recommended that Plaintiff be allowed to use ibuprofen, from 400 mg to 800 mg up to three times a day as needed basis, with a maximum dose of 2400 mg per day. Ultimately, Dr. Zeluff believed Plaintiff would continue to develop degenerative changes of the wrist for which wrist fusion with a stabilizing plate and bone graft would be recommended (as discussed by Dr. Miller). Dr. Zeluff agreed this would probably be required at some point, but he did not recommend the procedure at that time. (*Id*. at 3.)

     An individual named Bryan requested a referral to Dr. Wulff for left wrist pain on August 22, 2018, which was approved on August 28, 2018. (ECF No. 56-14 at 2.) Plaintiff complained of left wrist pain on February 28, 2019, and was ordered ibuprofen. (ECF No. 56-16 at 2.) There is a document dated March 15, 2019, indicating Plaintiff refused an appointment with Dr. Wulff.

(ECF No. 56-15 at 2.) An orthopedic consultation was requested again on May 15, 2019. (ECF No. 56-16 at 3; ECF No. 56-17 at 2.)

Plaintiff saw Dr. Walls on June 10, 2019. Dr. Walls discussed surgery or leaving his wrist as is, and Plaintiff again elected to leave it as is. (ECF No. 56-18 at 2.)

Plaintiff was then seen on September 21, 2021, for a follow-up for his left wrist. He cancelled the appointment stating that he did not request it, and he did not require the provider's intervention. He said the surgery was denied so he no longer needed medical for this condition. (ECF No. 56-19 at 2; ECF No. 56-20.)

**B. Eighth Amendment Deliberate Indifference to Serious Medical Needs**

"The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213.

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

**C. Rowley**

"42 U.S.C. § 1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation[.]" *Id*. (citations omitted).

Rowley was a senior correctional officer on ESP's Correctional Emergency Response Team (CERT), and he was assigned to transport inmates to and from appointments at the local hospital. Rowley was not in charge of scheduling inmate medical appointments. Orders for medical appointments come from medical staff, and then transport orders are generated. Custody staff, such as Rowley, have no say in when and where an inmate is seen for medical treatment. Instead, his responsibility is to complete the transport safely. (Rowley Decl., ECF No. 54-2.)

Plaintiff provides no evidence to create a genuine dispute of material fact in response to Rowley's evidence that he was not involved in any manner in scheduling Plaintiff's follow-up appointment at WBRH. Therefore, summary judgment should be granted in Rowley's favor.

**D. Carpenter**

In her declaration, Carpenter states she was employed as the Director of Nursing at ESP, and as such, was responsible for ESP's nursing staff, as well as for first level grievances and the reversal of medical charges. When NDOC providers order an appointment with a specialist at the hospital, the Health Information Coordinator (HIC) at NDOC is responsible for calling the hospital and arranging the appointment(s). The HIC is also responsible for rescheduling cancelled appointments. The URP is a group of NDOC nurses and physicians in Carson City that make decision regarding surgical procedures that are ordered by an NDOC physician or recommended by outside specialists. Carpenter did not have authority to approve or deny surgery for an inmate. (Carpenter Decl., ECF No. 54-1.)

Carpenter presents evidence that as Director of Nursing, she did not have involvement in scheduling Plaintiff's appointment at WBRH. Nor was she involved in the approval or denial of surgery for Plaintiff. Finally, Plaintiff's medical records do not demonstrate Carpenter had any involvement in Plaintiff's care. Instead, the medical records show that between the time of his injury in May 2017, and through October 2017, Martin was responsible for any referrals related to Plaintiff's care.

Plaintiff provides no evidence to create a genuine dispute of material fact regarding Carpenter's participation in the alleged constitutional violation. Therefore, summary judgment should be granted in Carpenter's favor.

**E. Martin**

There is a genuine dispute of fact as to whether Martin was deliberately indifferent. While Martin argues that Dr. Akinbo did not *order* surgery, the records from Plaintiff's May 22, 2017, visit clearly indicate that surgery was recommended at that point and that pre-authorization was to be obtained. Dr. Akinbo indicated he could not do the surgery that day or the following day, because the screws needed for the surgery had to be shipped in. Dr. Akinbo said he would perform the surgery when the screws were available.

Despite a clear recommendation for Plaintiff to have surgery at that point (when the hardware became available), there is no record that Martin made a referral to the URP to authorize the surgery. When Plaintiff was next seen at WBRH on June 6, 2022, he believed he was going there to get surgery, but Dr. Akinbo said the State had denied the surgery so Plaintiff was being treated conservatively. It is unclear who from the State denied the surgery, but according to Defendants' records, the URP makes decisions to approve or deny surgery. The URP makes those decisions when it is given a request from an inmate's provider, which in this case, would have been Martin.

The court has declarations from Carpenter and Rowley, but there is no declaration from Martin indicating what he did in response to Dr. Akinbo's recommendation for surgery, *i.e.*, whether or not he sent a referral to the URP, and if not, why? And if so, what was the response? Nor does Martin provide any explanation regarding Dr. Akinbo's statement that the surgery had been denied by the State, or whether Dr. Akinbo was mistaken. Plaintiff similarly provides no evidence in this regard. If a jury concludes that Martin received Dr. Akinbo's surgical recommendation, but he failed to submit a referral to the URP, the jury could conclude that Martin knew of and disregarded a risk to Plaintiff's health (malunion leading to deformity in the

wrist and pain). On the other hand, it is possible that a jury could determine that Martin did not proceed with a referral to the URP because he was awaiting to hear from the hospital regarding the availability of the screws before proceeding with the referral, or that he did process the referral, but it was the URP, and not Martin, that was responsible for denial of the surgery.

Without a resolution of these facts, the court cannot determine that either side is entitled to summary judgment as a matter of law. As such, both Defendants' and Plaintiff's motions for summary judgment should be denied as to Martin.

### F. Qualified Immunity

"In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citing *Saucier v. Katz,* 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)).

As noted above, taking the facts in the light most favorable to Plaintiff, it is possible that Martin was deliberately indifferent to Plaintiff's serious medical need. Moreover, it was clearly established that a denial of medical treatment can violate the constitution. *See Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022) (citing *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014)). Therefore, Martin is not entitled to qualified immunity.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **DISMISSING WITHOUT PREJUDICE** John Doe 1 due to Plaintiff's failure to timely substitute a defendant in his place;

(2) **GRANTING** Defendants' motion (ECF No. 54) as to Rowley and Carpenter, but **DENYING** Defendants' motion as to Martin; and

(3) **DENYING** Plaintiff's motion (ECF No. 62).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: January 17, 2023

_____
Craig S. Denney
United States Magistrate Judge